UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LUCAN GUY KEISNER,

    Petitioner,

vs.

RICHARD LOCKWOOD, Warden,

    Respondent.

No. C 05-2285 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. The time for petitioner to file an optional traverse has passed without his filing one. For the reasons set out below, the petition will be denied.

## BACKGROUND

A jury convicted petitioner of first degree murder, first degree burglary, and attempted first degree robbery. He was sentenced to twenty-five years to life in prison. His conviction was affirmed on direct review by the California Court of Appeal, and the California Supreme Court denied review.

Petitioner does not dispute the following facts, which are excerpted from the opinion of the California Court of Appeal:

> Appellants were convicted of murdering Julius Aubrey during an unsuccessful home invasion robbery.
>
> Aubrey was a Native American who was a member of the Yurok tribe. The tribe operated a casino in Trinidad and Aubrey regularly received a share of the casino's profits. Aubrey also abused illegal drugs and he was known to ingest large amounts of cocaine, methamphetamine and marijuana.

Because Aubrey was thought to have money and drugs at his home, someone hatched a plan to rob Aubrey of both. Some evidence indicated the crime was planned by Bonnie Rae Steele, a relative of Aubrey, who had been to his house in the past and who was aware that he received a payment of approximately $3,000 at the beginning of every month. Steele thought Aubrey was a good target because, as a drug abuser, he would be unlikely to call the police. Other evidence suggested that Hanley, who had worked for Aubrey at his home in Trinidad, planned the crime.

On the evening of December 2, 1999, Steele, Keisner, Bowman, Hanley, and another man, Nickie Metcalf, got into Bowman's car and drove to Aubrey's home. Aubrey was home that evening with a friend, Billie Pinckard. Aubrey was asleep on a couch. Pinckard was watching television. Someone knocked on the front door. Pinckard ignored it. A few moments later, Pinckard heard a noise at the back door. Almost immediately, four men entered from the back. The first three wore ski masks. The fourth wore a hood. The first man seemed to be in charge. He carried a knife and did most of the talking. He demanded "money" and "drugs." Aubrey, who had awakened, said something like "Who are you?" He was heard going through kitchen drawers, looking for something he could give the intruders. When Aubrey could not find anything, he told the intruders they would not get away and that they would be arrested. The man with the knife replied that it did not matter because he was already facing a lengthy prison term. [FN2. The parties stipulated at trial that on the date of the crime, Bowman was out on bail awaiting trial on charges that could have resulted in a 12-year prison term.]

The three unarmed men started to leave through the back door. At that point, without warning, the last man to leave[] lunged at Aubrey with a knife, stabbing him in the chest. He then pulled the knife out and calmly walked out the back door. Pinckard called 911.

Steele had been waiting outside for about five minutes when Keisner, Bowman, Hanley and Metcalf came running out of Aubrey's house and jumped into the car. The situation was chaotic. Keisner asked Bowman repeatedly "why he did it." Bowman was "freaking out." He replied, "Do what?" and somewhat inconsistently that he "[did not] know." Keisner got into the driver's seat and sped off. He drove so recklessly that Steele thought they might drive off a cliff.

As the group was fleeing, the car hit a ditch and stalled. Keisner pulled off the road and everyone got out. Keisner saw a pickup truck parked nearby. He approached the truck, holding a knife behind his back (a different knife from the one used against Aubrey). Keisner asked the occupants, Tara Hannon and Wilson McFarland, if he and his companions could have a ride. Hannon and McFarland agreed and they drove the group to Arcata.

Once in Arcata, Keisner called Nickie Metcalf's wife Kelley and asked for a ride. He said "somebody had been stabbed." Kelly drove to Arcata and retrieved the group. After dropping Keisner, Hanley and Steele off, Kelly drove her husband and Bowman back home. She noticed what appeared to be blood on Bowman's jacket and helped him wash it. As they sat around talking, Nickie Metcalf told Bowman, "I can't believe you did that[.]"

Police investigating the murder quickly identified appellants as suspects.

They found Bowman's car where appellants had abandoned it. Aubrey's blood was inside as were fingerprints from Hanley and Steele. Police found a knife with blood on it on the ground outside the driver's door of the car. A criminalist concluded the blood was of the same type as that of the victim. Two neighbors identified the car as having been parked near Aubrey's house on the night of the murder. The police had Billie Pinckard listen to a tape recording of several voices. She identified Bowman's voice as being the man with the knife. Tara Hannon identified Keisner as being one of the men to whom she had given a ride on the night of the murder.

Bowman repeatedly confessed to others that he had been involved in the murder. On one occasion he told his girlfriend Katherine Hynes that he had driven to Aubrey's house and that a man there had been stabbed. On another occasion Bowman told Hynes that he "killed that guy in Trinidad." After Bowman was arrested he admitted to a cellmate that he "stabbed [Aubrey] in the heart," "twisted-the knife," and heard "a popping sound."

Hanley also confessed his involvement in the crime. His detailed statement to the police was recorded.

Keisner was arrested on January 15, 2000. After being identified and ordered to stop, Keisner fled. The police chased and caught him. During an ensuing struggle, Keisner threatened to stab himself with an ice pick.

Based on these facts, an information was filed charging appellants with the offenses set forth above. As to the first count, and as to Bowman only, the information alleged as special circumstances that he committed the crime during the course of a robbery and burglary (§ 190.2, subds.(a)(17)(A) & (a)(17)(G)), and that he personally used a knife when committing the crime (§ 12022, subd. (b)(1).)

The case proceeded to trial where the prosecution presented the evidence set forth above. Counsel for Bowman and Hanley both admitted their clients were involved in the crime. Bowman's counsel argued that his client was so incapacitated by his ingestion of drugs that he lacked the capacity to form the intent necessary to commit the crimes. Counsel for Hanley said his client's involvement was minimal. Keisner's counsel took a different approach. He denied Keisner was involved in the crime at all.

The jurors considering these conflicting versions convicted appellants of murder, robbery, and burglary. As to Bowman, the jurors found the special circumstance allegations and the use enhancement to be not true.

Ex. F at 1-4. The trial court sentenced each of the defendants to a term of twenty-five years to life. *Id.* at 4.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

3

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

///

4

**DISCUSSION**

As grounds for federal habeas relief, petitioner asserts that: (1) His Confrontation Clause rights were violated by admission of a statement made by a co-defendant to the police; (2) his due process rights were violated by the trial court's rejection of his request for a circumstantial evidence instruction; and (3) the trial court violated his due process rights by giving CALJIC 17.41.1.

**I.   *Bruton* Claim**

At the joint trial Hanley's confession to the police was admitted against him. Ex. F at 5. The confession was redacted to remove references to the other participants in the robbery, but the redactions were achieved by means of blacking out their names. *Id.* The trial court gave a limiting instruction, telling the jury to consider Hanley's confession only against him, and an instruction not to speculate on the reasons for any deletions. RT 2043. Petitioner contends that these redactions were insufficient to prevent admission of the confession from being a violation of his right to confront witnesses against him, in this case the non-testifying co-defendant Hanley.

The redactions to which petitioner objects were set out by the court of appeal:

(1) The interviewer tries to determine how Hanley gained entry to Aubrey's house by asking, "And [black mark] you went in through the front door?" Hanley replies, "I believe it was the back door."

(2) The interviewer asks Hanley what happened once he got inside. He replies, "Ah well [black mark] asked for money somethin' dope money somethin'."

(3) The interviewer asks, "what happened after you [black mark] went out?" Hanley replies, "Got in the car and left. Ha."

(4) The interviewer asks Hanley what happened after the car in which he was fleeing broke down. Hanley replies that he got a ride from someone in a pickup truck. When asked whether he jumped in the back, Hanley replies, "Uhuh [black mark] just laid down in the back and got a ride to Arcata."

(5) The interviewer asks what happened after Hanley got to Arcata. He replies, "[Black mark] Just hung out and just kinda' hung out I guess until [black mark] found the ride back to Eureka."

(6) At one point during the interview, Hanley muses as follows, "guess everything just got outta' hand or somethin' just happened and I didn't know ya' know what the hell to think [black mark]. And then fuckin like I don't know when it was [black mark] heard that he died or somethin'."

5

(7) At another point in the interview, Hanley says that Bonnie Steele planned the crime. According to Hanley, "It was Bonni's idea. She called me and told me that she had a plan to fuckin' do somethin' ... and she told me she was gonna' come over there and she'd [sic] tell me and...." At that point, the interviewer asks, "So she came over to the house[?]" Hanley replies, "No she never did make it but [black mark] went and picked her up [black mark.] She paid for gas and shit like that."

(8) Later the interviewer asks Hanley whether the killing was planned. He replies, "No. [black mark.] I didn't even know where ever the knife came from. [black mark] But, I didn't have no knives, no weapons on me. Ya know."

The redacted confession also included passages that indicated more than one person was involved in the crime. The following are examples:

(9) The interviewer tells Hanley he should think about what "they've said to us." Hanley replies, "... I didn't even see it. All I heard was the scream and fuckin' ya' know that's it."

(10) Hanley tells the interviewer "I wasn't even there. I wasn't even like, I didn't even see him get stabbed or nothin'. All I heard was like a scream."

(11) Hanley states that he "... started walkin' towards the back and I seen ... I hear 'im fuckin' scream AAAAHHH or somethin' "

(12) The interviewer tells Hanley he wants to understand the extent of his participation in the crime. Hanley replies that someone stabbed Aubrey but that he didn't do it.

(13) Hanley tells the interviewer he never saw the knife that was used to stab Aubrey, and that he "didn't stab no one."

(14) Hanley tells the interviewer, "... you're sayin' everybody else is talkin' shit, but maybe they're not."

The confession also includes passages where Hanley makes general comments about the crime. The following are examples:

(15) The interviewer tells Hanley he believes he was involved in the crime. Hanley denies it initially.

(16) Hanley tells the interviewer he did not know what was going to happen on the night of the crime, and that he simply ended up at Aubrey's house.

(17) Hanley contradicts himself and admits he knew "something" was going to happen because Aubrey had marijuana and money.

(18) Hanley tells the interviewer he did not try to call anyone when he became stranded, because he did not know anyone who had a car.

(19) Hanley admits that he took $15 from a counter in Aubrey's house and that he used to [sic] money to pay for phone calls.

Ex. F at 5-6 ; ex. G (Order Modifying Opinion) at 1-2.

A defendant is deprived of his Sixth Amendment right of confrontation when a confession of a non-testifying co-defendant that incriminates them both is introduced at their joint trial, even if the jury is instructed to consider the confession only against the co-defendant. *Bruton v. United States*, 391 U.S. 123, 126, 135-36 (1968). A *Bruton* claim, like all other Confrontation Clause claims, is subject to harmless error analysis. *United States v. Rashid*, 383 F.3d 769, 775-77 (8th Cir. 2004).

Where the co-defendant's confession does not on its face incriminate the defendant, but rather will only incriminate the defendant if "linked" via other evidence introduced at trial, and the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence, the Confrontation Clause is not violated by admission of the confession with a proper limiting instruction to the jury. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). But if the co-defendant's confession is redacted to remove all direct reference to the defendant by replacing references with blanks or the word "deleted," the confession will violate the Confrontation Clause, because the confession obviously refers directly to someone, and too often that obviously will be the defendant. *Gray v. Maryland*, 523 U.S. 185, 191-95 (1998).

Although the California Court of Appeal concluded that the parts of the confession labeled "1, 3, 4, 8, 15, 16, 17, 18, and 19" above "do not refer to Keisner or anyone else," it agreed with petitioner that others "do arguably indicate that some other person or persons may have been involved in the crime." Ex. G at 2. Because it clearly is true that one or more of the excerpts incriminate some person or persons other than Hanley, this court need not resolve whether the court of appeal was correct that some of the objected-to excerpts do not incriminate anyone. The excerpts that the court of appeals considered to be arguably incriminating are "2, 5, 6, 7, 9, 10, 11, 12, 13 and 14." *Id.*

In *Gray* the United States Supreme Court flatly held: "Redactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . leave statements that, considered as a

class, so closely resemble *Bruton*'s unredacted statement that, in our view, the law must require the same result." 523 U.S. at 192.  Because the confession at issue here had "obvious indications of alteration," *Gray* would appear conclusive that the redactions were not sufficient and that introduction of the confession violated petitioner's rights. Respondent, however, contends that *Gray* is distinguishable.

Respondent asserts that *Gray* does not control because the redactions could have referred to a group of people who were or might have been involved in the crime, thus not specifically pointing to petitioner.  The fact remains, however, that this was not the situation mentioned in *Gray* as an acceptable redaction, where a statement might be changed to read "Me and some other guys . . . ," without any indication that specific names had ever been provided; here, the redactions were black lines which *did* make it clear that Hanley had provided specific names of someone, and the jury most likely would immediately deduce that that someone was petitioner.  *See Gray*, 523 U.S. at 196.  Respondent's efforts to obscure the impact of *Gray* fail.  Petitioner's Sixth Amendment rights were violated by admission of the inadequately-redacted statement.

The court of appeal held that petitioner's rights were not violated because the redacted statements were not "facially incriminating." Ex. G at 2.  As the Court held in *Gray*, "the redacted confession, with the blank prominent on its face, in *Richardson*'s words, '*facially* incriminate[es]' the codefendant." *Gray*, 523 U.S. 185 (1998).  That is, the Court held that a confession with prominent redactions, such as spaces or the word [delete], does indeed "facially incriminate" the defendant.  This is directly contrary to the holding of the court of appeal here.

The court of appeal also listed several of the redacted statements quoted above and concluded that the redactions simply meant that "someone" in addition to Hanley was involved -- asked for money, found a ride, heard the victim had died. Ex. G at 2-3.  "Since there were four persons who entered [the victim's] house and only three persons on trial, the statements did not necessary [sic] point to a defendant[,] let alone to Keisner specifically." *Id.*  However, in *Gray* the confession implicated two persons in addition to the

8

person confessing (one died before trial), and in *Gray* the evidence was that at least five people were involved in the beating. *Gray*, 523 U.S. at 188-89, 202 (Scalia, J., dissenting). The Court recognized that some cases might involve two or more redacted names, and that there might be evidence at trial that "there are more participants than the confession has named," but nevertheless held that the same "legal results" as in *Bruton* are required in such cases. *Id.* at 194-95. This holding in *Gray* is directly contrary to the court of appeal's reasoning.

The court concludes that petitioner's Sixth Amendment rights were violated by admission of the inadequately-redacted confession and that the court of appeal's conclusion on this point was contrary to clearly-established Supreme Court authority.

The court of appeal also concluded that any error in admitting Hanley's redacted confession was harmless. Ex. at 8-9. This alternative holding now will be considered. *See Medina v. Hornung*, 386 F.3d 872, 878 (9th Cir. 2004) (federal court must determine whether state court's harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly established federal law, before applying federal harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

The California Court of Appeal noted that an eye-witness and participant in the crime, Bonnie Ray Steele, testified that petitioner was directly involved in the murder of Aubrey, and described his involvement in detail. Ex. F at 9; RT 1770-79. Steele's testimony was strengthened by Kelley Metcalf's testimony, whom petitioner called the night of the murder and told "someone had been stabbed." *Id.*; RT 1030. Finally, Tara Hannon testified to giving a ride to four men and a woman the night of the murder and identified petitioner as being one of the men she gave a ride to on the night of the murder. *Id.*; RT 1102-08.

This evidence was such that the court of appeal's conclusion that any error in admission of the confession was harmless was not contrary to, or an unreasonable application of, clearly-established Supreme Court authority. As a result, relief cannot be granted on this claim.

9

**II.     Jury Instruction Regarding the Permissible Use of Circumstantial Evidence**

Petitioner's second claim is that the trial court violated his due process rights when it refused to instruct the jury regarding the permissible use of circumstantial evidence. In the petition this claim is presented with a conclusory allegation that petitioner's "due process" rights were violated by failure to give the instruction, with a reference to the "attached arg[ument]." The attachment is a portion of an appellate brief. The extent of the federal law argument as to this claim is: "This [state law duty to sua sponte instruct on applicable law] implements the state and federal due process right that every charged defendant has to a jury determination of all elements of the offense with which he is charged beyond a reasonable doubt." Pet., attachment at 38. This is followed by citations to three federal cases having to do with the reasonable-doubt standard. *Id.* But in this case the instruction has nothing to do with the elements of the crime, so petitioner has failed to allege a federal law basis for his claim; it is, in fact, nothing but a state-law claim. Because a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings, this claim is without merit. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).

Alternatively, failure to give the instruction did not violate due process. CALJIC No. 2.01 states:

> However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.
>
> Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt.
>
> Also, if the circumstantial evidence as to any particular count permits two reasonable interpretations, one of which points to the defendant's guilt and the other to his ... innocence, you must adopt that interpretation that points to the defendant's innocence, and reject that interpretation that points to his . . . guilt.

10

> If, on the other hand, one interpretation of this evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

Ex. F at 10, n.5.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). In *Holland v. United States*, 348 U.S. 121 (1954), the Court rejected a contention that an instruction similar to the one demanded here should have been given, saying that "where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect." *Id.* at 140. Although the Court in *Holland* was not presented with a constitutional claim, so the holding is not directly applicable to this state conviction, failure to give an instruction which has been so criticized by the Supreme Court surely could not be a due process violation, and in any event there is no clearly-established Supreme Court authority saying that it is. There was no due process violation.

### III.     CALJIC No. 17.41.1

Petitioner claims that the trial court violated his right to due process by giving CALJIC No. 17.41.1 and that such an instruction inhibits jury deliberation and invades jury privacy. CALJIC No. 17.41.1 provides:

> The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on [penalty or punishment, or] any [other] improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation.

The Ninth Circuit has held that there is no "clearly established United States Supreme Court precedent" which establishes that an anti-nullification instruction such as CALJIC No. 17.41.1 violates a constitutional right. *Brewer v. Hall*, 378 F.3d 952, 955-56 (9th Cir. 2004). The court therefore held that a California appellate court's rejection of a challenge to 17.41.1 could not be contrary to, or an unreasonable application of, clearly established Supreme Court authority. *Id.* at 956. In light of *Brewer*, that the trial court gave

11

CALJIC No. 17.41.1 cannot be the basis for federal habeas relief.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated:  March 2, 2009.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.05\keisner2285.RUL.wpd